May it please the Court, Attorney Cal Potter, Las Vegas, Nevada, on behalf of Mr. John Oliver Snow, this is an appeal from the District of Nevada, the Reno Division. Knowing that the Court is familiar with the facts of this case, I would like to turn on why the Court erred in denying our motion in limine as the plaintiff appellants. Counsel, before you do, before I forget, has your client had the surgery? He has. The left hip was operated on January 29th of 2014, the right hip a year later, February 18th, 2015. Thank you. Of the surgery did not take place until after the briefing in the case. I want to focus on why the Court erred in denying our motion in limine dealing with the fact that Mr. John Oliver Snow is a death row inmate. We brought the motion on because we knew of the volatile nature of the fact, although at the time of trial we were going to trial on an injunctive relief, or at least we thought we were, and also on the damage component of what had occurred as a result of not receiving the surgery over a long period of time. Has the surgery taken place? Yes, sir. It took place on the left hip on January 29th of 2014. And when did he say it's okay for the operation? He had to approve it first. When did he do that? He did that during the time of trial. That was an issue. And then we continued after the time of trial to try and get him the surgery. It languished for a long period of time. The left hip was done at one point in time, then he was moved back. Ely State Prison is on January 29th of 2014. Did I take it? It is not, Your Honor. It was done about a year afterwards. We brought on a motion for an order to show cause. It was denied because the case was, of course, on appeal. It's not before us, but at least we know he's now been operated on. He has been operated on. In terms of the injunction, though, Your Honor, there are still residual issues in terms of the collateral injuries because he didn't receive any type of physical therapy, which was normally. But at the time of trial, it was our belief that if we could go to trial on the injunction because it had not been done, it was still a factual question of whether it was a heart problem that was preventing him from getting the surgery, whether it was obesity because he was heavy, or whether the State of Nevada Department of Corrections simply did not want to give him the surgery based upon a long history of the Utilization Review Committee, family doctors for the most part, overriding the experts, the orthopedic surgeons who he had been referred to on at least two occasions, as well as other doctors within the system, stating that a chronic injury such as bilateral arthritic condition in the hips could become. I understand that you're going way outside the record. What we have here is that he was not given the surgery. You brought the case up to us. We gave you an opinion. Yes. And then the State said, okay, we authorize it as soon as he agrees. That's how much we have on that so far, right? Right. And we know the operation has taken place. Correct. What's left? What's left is dealing with the aftermath of it. But he didn't get a fair trial. And the court took umbrage because the Court of Appeals on the first occasion reversed the summary judgment and said that what I was just talking about, and that is in the record, Your Honor, that general practitioners cannot override the opinions of experts, such as orthopedic surgeons, in this instance two orthopedic surgeons, Drs. Long and Dr. Rhodes, who both talked about the fact... We said that in our last opinion, and they've responded, and the operation has taken place. I'm just wondering what's left for us to deal with. What's left are the damage components, Your Honor, in terms of the pain and suffering that the individual went through over this long period of time, in addition to the long period of time even after the trial in this matter. But, Counsel, the issues on... Excuse me, Judge Gristin. Go ahead, Judge Gristin. I just think you may be talking past each other. The issue on appeal that's left isn't the injunctive relief question. Right. The issue on appeal is, as I understood it, the evidentiary issue. It's an evidentiary issue as well as the injunctive issue, Your Honor, because of the fact that... I'm just trying to watch your time, and I'm not sure you were focused on Judge Silverman's question. Let me tell you the concern I have. As I understand it, before the trial, there were a number of motions back and forth. Tell me if I have this right. I'm not sure I do. My impression is that it was Mr. Snow's theory that the Department of Corrections denies these kinds of operations to people who are on death row. Was that his theory? It's larger than that, Your Honor. Is that part of it? It's part of it, Your Honor. It's the chronic conditions that are non-life-threatening. Gotcha. But let me stick to this part of it for a moment. If I understand correctly, then, let's see, we have Judge Jones said, I'm not going to let you bring up what they do to other death row inmates, but the death row itself is in play. Is that a correct reading of what he did? What he did, Your Honor, was that it wasn't just death row inmates. There was a class action suit that had been filed by the ACLU against the Ely State Prison dealing with... it's a maximum prison where death row is located, and it's a situation where not only death row inmates were repeatedly denied any type of medical conditions for chronic conditions that could be life-threatening, but also death row inmates. What I'm trying to get at is the rationale for why Judge Jones allowed testimony about him being on death row, and it sounds like you're saying it was, at least according to the pretrial motion practice, part of the theory of the case. Well, the reason he did it, he didn't engage in any 403 analysis. What he wanted to do was make sure that he said the complete story is told. Well, that's what I'm saying, isn't that part of the complete story? No, that isn't the story, because it's more prejudicial and probative. Well, it may be, but it's part of... Well, hang on, excuse me. It may be prejudicial, but it's still part of the whole gestalt of how it was being presented, wasn't it? No. And the reason it wasn't... Didn't your client lose a... Let me hear what he says. What was your answer to my question? It was not, Your Honor, because the entire situation dealt with other inmates that were life imprisonment as well. The only... Counsel, your time is ticking. I understand that. These are really critical questions, and our understanding from the record is there were several motions in limine. And I understand that your client had one theory going into trial, but prior to trial, didn't Judge Jones rule that that other evidence about other prisoners on death row or not was not going to come in? He did. Okay. So at that point, counsel, at that point, going into trial, that's what Judge Silverman's trying to get at. That's what I'm trying to get at. At that point, why was your client's status as a death row inmate relevant? It wasn't relevant, Your Honor, and that's the whole point. Well, the judge said it was background, and he said it was context. What is your response to that, please? It isn't, because what he wanted to do was... And what he told counsel is you can't say that a death row inmate isn't going to get any money. It's just going to go to his attorney and his heirs. And that was the reason that I believe the court ruled as it did, because no jury is going to give a death row inmate money damages if they know that he is on death row. And the issue then became, why didn't the court, as instructed by this circuit in the same district court judge, Judge Walsh was on that panel and told him that you have to go through an analysis to determine whether, in fact, it's more prejudicial than probative. He did not do that. Instead, he substituted a test that he believed was the complete story. I would submit to Your Honor that based upon that, that is the error in the case. Did he do that? He did offer to give a limiting instruction, but the limiting instruction that was given, which the Attorney General has talked about throughout their brief, deals with a general limited instruction. Didn't he offer to give a further instruction that you folks decline? He did. Why was the ration offered that? Because of the fact that you can't unring a bell once you have it out there. And once the death row has gone forward... You'd rather have no instruction than a limiting instruction? The instruction that was given was the general instruction. It also deals with... I'm talking about the one that he offered and you declined. What's the rationale for declining? The rationale was not to put further emphasis upon the finding whether, in fact, an individual can receive money damages. I don't understand. The judge was... You were arguing about the process, so the judge says, okay, you get to give me an instruction on what the jury is to consider, but then you didn't do that. That's correct, Your Honor. And that's the judgment call on our part. Well, haven't you waived the problem when he has figured a way out of it, and then you choose not to go that way? No, because he didn't figure a way out of it. He figured a way that we could never recover money damages. Once he denied the motion and limiting, that affected it. He did the same thing in terms of the systemic problems. The ruling was that there were ways to prove this. He confused Monell. There was never a Monell claim because it's a state of Nevada. He then ruled that we couldn't bring in, because his fear of other inmates being brought into a courthouse. You had this theory that you were going to prove pattern in practice, and you won that case, but under the Eighth Amendment, you have to show deliberate indifference. And that's how you show this. Deliberate indifference to your defendant. That's how you show the subjective component, Your Honor. Estelle v. Gamble has the two prongs. We're dealing with the subjective component, showing that it was a pattern of practice of not only the director of medicine, but the warden and the assistant warden, as well as all the other people. The Kavanaugh case, which was a companion case, dealt with a situation where an individual who was diabetic and was insulin dependent was taken off for three years. Mr. E.K. McDaniel, who was the warden, became his guardian, although he's supposed to be carrying out, in that he also served as his guardian. He did the same thing in terms of Mr. Snow. They then became his guardian when he went to get his treatment for his cardiac problems at the Tahoe Carson. So based upon those, we believe that the systemic problems could be brought in with the utilization privilege manuals. That was the American Civil Liberty Union's case against the conditions. But why do you get all of that to show deliberate indifference? Don't you have to show deliberate indifference to this defendant? We did. We did show it to him, but it also bolsters and shows, and we had the testimony of a whistleblower, Lorraine Memory, who could testify that, in fact, this had gone over a period of many, many years. They didn't even have a doctor at one point in time at the Ely State Prison. Instead, they used a physician's assistant, Mr. Max Carter, who in fact wrote in there. So Judge Jones says, I'm not going to let you go out on that limb. He felt that that was too far away from the actual case. He didn't bother to look at any of the facts. If you look at the hearings that went on, he's ruling off the cuff. He's also making decisions that the other side criticized us for not making proper proffers, but they're in the written pleadings. I see that I have a couple of minutes left. I will reserve the remainder of my time. Thank you, Mr. Potter. Good morning, Your Honors. May it please the Court, my name is Clark Leslie. I'm the Assistant Solicitor General for the State of Nevada. Can I ask you a question right off the start? There's no sense in you giving a speech. You know what's going to happen. That I do. I want to go back to the issue we were just dealing with here. If there's any tendency to prove a fact, then it's admissible. Judge Jones didn't let them go into anything that they wanted to go into showing this so-called pattern in practice. It strikes me that that is a problem that needs to be looked at. What's your response to his argument? It does have a tendency to prove that there was deliberate indifference if there's been deliberate indifference to all other prisoners for the last 40 years under the supervision of the current people or whatever the facts may be. What's your response? Thank you, Your Honor. Mr. Potter brought up the Kavanaugh case. He brought up the Riker case. He said that they wanted to show a pattern of practice and custom that certain inmates were treated a certain way or did not receive treatment. However, when it came to actually establishing the evidence that's necessary under Monel to be able to present to a jury policy and practice type of arguments, it woefully failed. Mr. Snow was unable to show that there would be any significant evidence that would not be tainted by one reason or another. And the Kavanaugh case, and Mr. Potter knows this because he was involved in it to some extent, is a perfect example of why that kind of evidence should not have come out. And let me also mention beforehand, the Riker case was ultimately settled. There was not a consent decree. It was found that at worst on a red light, yellow light, green light basis, the Nevada Department of Corrections was in the yellow in a few places. We retained the number one expert in penal medical treatment to advise us. We ended up settling where for three years there would be supervision. We would do whatever the supervising doctors told us and that was it. Some payment was made to the ACLU for their attorney's fees and nothing else. No consent decree. In Kavanaugh, and I think this is the reason why Judge Jones said, no, I'm not going to let this kind of information come before the jury, an exceptionally unique case. A mentally disturbed man who was both refusing to take his psychotropic medications and was refusing to eat. No one could convince him to act or say or do differently. A lot of different things were tried with Mr. Kavanaugh in order to get him to take And that case was settled as well. But that was so off the pale, so unique, such an outlier of a case. And as Judge Jones says, I don't want a parade of death row inmates coming into my courtroom. You know, and the reasons I think are pretty obvious. Forget the security. Everyone has a tail. Everyone has an argument. Everyone has a bone to pick. But counsel then said, I'm not going to parade them in. I've got experts I'm going to use that are going to read the records and give testimony. Well, he had an opportunity to bring experts in. He had an opportunity to have whatever testimony he wanted presented as to John Snow. And as I think as your Honor pointed out during your questioning of my esteemed colleague and opponent, this is a case about deliberate indifference as to John Oliver Snow. If it's only a case about deliberate indifference as to this one defendant, and it was after Judge Jones ruled that that's what it was going to be, why was his status as a death row inmate relevant? Why did it make any fact that issue more or less likely to be true, counsel? Judge Jones explained, and you used the correct phraseology, your Honor. It was necessary for context. What context? Well, death row inmates are segregated from the rest of the inmate population. So are some other inmates who are in segregation. You don't need to know that they're on death row to know that they're segregated. Right. But also that creates some unique issues and complications at times for the provision of medical care. And before you say to yourself, my God, he's giving his case away, he's pointing out that there is some kind of problem with giving medication. I'm waiting for a relevance answer. The answer is it was for context. What does that mean? That's what the judge said, for context. And I think he said background. I don't know what that means. Under 401, what fact that issue was made more or less likely to be true because this man was on death row? The jury would be told that he went into prison in 1980. The jury would know that he's 71 years old. The jury would not hear that one reason that he was going to have a surgery was because when he got out of prison, he wanted to go snowboarding or whatever. A jury would be entitled to know that this person is never getting out of prison. And that may or may not be true. I'm not sure they would be, but even if they would be, that's different. Having a sentence of many years or even life imprisonment is different than death row. And I'm not saying that you've convinced me that they're entitled to know the length of his sentence, but even if they're going to hear that he's been in since 1980, they would know he'd been in a very long period of time. So what? Well, Your Honor, all I can say is that the judge agreed that there would be context. We didn't ask him, what do you mean by context? But we have an inmate who's going to be coming into the courtroom, and he's been incarcerated for a long period of time. And the judge felt it would be appropriate to let the members of the jury know what his status was. The real question, I think, is let's assume for some reason that that was not the most correct decision that Judge Jones could have made. The issue is, was it reversible error? Was it so prejudicial that it affected the outcome of the case? I mean, that's really the standard of review that we have here. And let's also remember that had they won their motions, they would have been talking about death row throughout the entire case. They didn't win, counsel. And they knew that before trial. So before trial, everybody knew that their theory wasn't going to be what the trial was about. The trial was going to be about, as you said, just the care that was or was not provided to Mr. Snow. And they recognized that the prejudicial value was so minuscule that they mentioned the word death row during the trial more than we did. Counsel, you know that the response they've made in their briefing is that they knew it was coming in because you'd won the pretrial ruling on that, that the State was going to be allowed to introduce it, and he wasn't going to be able to keep it out. So he simply engaged in a very common trial tactic. He wanted the bad news to come out from his side of the podium first. That's not unusual. Well, you're right in the opening statement. And we all know this as trial lawyers. You prefer bad news to come out of your mouth rather than your opponent's mouth. But to keep bringing it up time and again, day two, day three, day four, day five of the trial, it shows something else, that there was not a fear of bringing death row information before the jury. In terms of getting into Judge Jones's mind and why he thought that it was all right to let the jury know about that, I'm not sure. He said context. We were fine with that. The question is, was it prejudicial? Did it significantly affect the outcome of the trial? And that was going to be my opening comments, Your Honor. Now, we had a jury trial. The system worked. After I stood before a different panel and had one of the most difficult oral arguments of my 42-year career, Judge Betty Fletcher wrote an opinion that I still get hate mail and nasty phone calls from other DAGs in other states. And, you know, what can I do? So we went to trial. And as Mr. Potter pointed out, they had a mass variety of witnesses to testify. They had Lorraine Memory and they had Boya Lemmich, who told the jury all these horrible things that they essentially wanted to bring in about policy and custom and practice at the prison. The jury heard all of that. They heard all of the nasty stuff, really, that they would have wanted to have the jury hear under a policy and practice theory under the case of Monell. The jury didn't buy it. That's how the system works. That's how it is supposed to happen. The constraints and the instructions from the Ninth Circuit published opinion were followed fully in this case. All of the theories, all of the arguments, all of the comments about a jury could find through a reasonable inference that one thing or another occurred that prompted the court to remand back, those were all litigated. Now, in terms of the 403, the Rule 403, and this kind of goes to what you were saying as well, Your Honor, there were no offers of proof. You know, at the very least, make a record so that this Court can decide whether or not an injustice had been done. Offer of proof of what? Of what they would have hoped that the policy and practice and custom evidence would have been, and where it would have gone, and what it would have shown, and how it would have bore on the issues that were raised by the published opinion from this Court. They didn't do that. Just as one of the members of this panel pointed out, they were given an invitation. Judge counsel, come up with a curative instruction or a protective instruction for all these things that you're upset about. They didn't even bother. They didn't even propose any. It's sort of like asking for an instruction that says don't think about the 800-pound gorilla. Don't think about the fact that he's on death row. How in the world would you do that? His argument in the briefing is you can't unring the bell. What is your response, please? You cannot unring a bell. And as experienced jurists, you know that you can give the instruction but there's only so much you can do. But a good judge is able to convince a jury, I believe, that these instructions mean something. And that when we ask you to follow your duty and you took an oath, your duty includes, to the extent humanly possible, put what I said you cannot consider out of your mind. I mean, why do we bother if it has no effect at all? We bother because we know that most a curative instruction, of course, we'll never know because we never got a proposed one from the other side. Counsel, it's why, I think you're right. We recognize that there's problems with instructions and with curative instructions. In many cases, we say, gee, it's the best they can do under the circumstances. Much easier to come to that conclusion when there is something, some relevance, some probative value to weigh against the prejudicial nature of the evidence. That's why I struggled to find some 401 relevance here. Again, I think the context is somewhat important because death row inmates are different. They have a different mindset. They have a feeling of segregation. In the transcript, in the excerpts of record, we find evidence where Mr. Snow was offered certain accommodations that are very rare for death row inmates. For example, he was offered a lower bunk. For example, he was offered to be placed closer to the nurse's station. Very unusual for, that may not ring or have much resonance with the juror unless they realize this guy is in the most maximum secure portion of the prison. So it does resonate. It does have relevance. Oh, and he refused those accommodations, which then bolstered our argument that he was not nearly in as much discomfort as he claimed to be. When you understand that something, other inmates that are in medium or unclosed security, these sort of things are taken for granted. But any accommodation you get in death row is very special. So maybe you think I'm stretching here. I really don't. I think that would be the relevance, the fact that death row inmates are unique. And to give them some idea of he's not just a prisoner. He's a prisoner that's being placed and watched under maximum security. If the case went back, what would be left to try? I mean, you'd get a new trial on this and then Mr. Potter said there's still injunctive issues to consider. Do you have a feel for what would still be in play? Well, if the case goes back to trial, I think I'll probably retire. Here's what's left. He's gotten his surgery. He was offered it first in 2012. He said no, I don't want to do it. He was offered it again. He said no, I want to lose some weight. Finally, he got the surgery. I guess the only thing left would be whether or not there was deliberate indifference between March of 2006 and the approval by the URP panel for the THA, the hip replacement, in 2009. So we'd have a closed period of around three and a half years where it could be argued that he experienced undue pain and discomfort. But as the jury determined and as we argued, it was not deliberate indifference to provide conservative care to this gentleman. By the way, if we'd put him on the table and done the THA without having done the cardiac testing, he would have died on the surgery table. So we did our due diligence. We provided very expensive... Okay, so, okay, but if he didn't get a fair trial, then what the jury found isn't particularly relevant. If it went back, you say he would get a new trial on the damages for that three year period. Anything in the injunction that's still open? Not that I know of. And I think that was a pretext to begin with. Is it something about physical therapy? There will be some therapy, but that's going to be provided by the independent medical provider that is going to be doing the surgery. That's part and parcel of what he'll get. Thank you, Mr. Lessing. Any other questions? No, thank you. Thank you, Your Honors. Thank you, Mr. Lessing. Mr. Potter. Let me tell you what the Attorney General at the time of the trial said. He said, ladies and gentlemen of the jury, I don't know about you, but I've got to tell you, I'm a little offended at the notion that a death row prisoner con man comes before you. I object. Your Honor, this is a personal vouching at this point. It's inappropriate. The eye should be struck the court. As to the second comment, I'll grant it. As to the fact that he's on death row, I won't because that was the entire purpose of the statements. It was the entire purpose of the ruling of the court was to deny this individual money damages because he was a death row inmate. The comments about Monell are still being made here. There was never a Monell claim. There can't be under the law. It's not a Monell claim. It was a systemic pattern of practice as to John Snow and these other maximum security inmates. Pattern in practice alone doesn't get you very far because you have to show deliberate indifference. Correct. So pattern in practice is your... It's a subjective complaint. This is your evidence that leads to that? We should be given that opportunity because it shows not only as to John Snow... I understand. ...but to all these other individuals that they did not intend to give treatment. They were deliberately indifferent to the serious medical needs of about 200 inmates in the state prison. So you wanted to show this whole case of 200 inmates when there's no case having to do with them, but just to show what happened for your client? Correct. And that's what shows the subjective component. It wasn't just poor John Snow, we just forgot about him. It was a situation where they intentionally denied inmates medical treatment for serious chronic conditions. And what was your offer of proof? Our offer of proof was in the motion about the Kavanaugh case. The court didn't want to hear any offer of proof. You have an offer of proof that you made? We did. We filed the motion dealing with the Kavanaugh case. The court didn't want to hear any of that. He had already made his decision up that that was judgment. I don't think, I don't think, I'm not in the Kavanaugh case. I'm in this case. Well, he was already in the Kavanaugh case. Excuse me. Let me ask my question before you answer it, please. Where in the record do I find your offer of proof that you made in this case when the judge said you can't do the pattern in practice? It's in the motion and liminese section of the argument. And this is the same... And then what did it say? When I go to read there, what will it say, your offer of proof, was? It will talk about the Kavanaugh case and the guardianship that I pointed out to you, that they were utilizing some type of guardianship method to either deny treatment or give treatment. And that was what happened in the Kavanaugh case. Okay. So that was your offer of proof. It was. It was part of the motion. Thank you. And you have to understand also is the hostility that was shown throughout the proceeding of the court, not to me, but to my co-counsel, Mr. Picker, who argued the motions in limine. And you have a replete in the record where Judge Jones apologizes for yelling at Mr. Picker. So in the offers of proof that are given, it's under a situation that's highly volatile, Your Honor. Thank you. I would submit it on that basis. Thank you. Thank you. Thank you, too. The case just argued is submitted. We're going to stand and recess for the morning. I understand we have some visitors. Glad to have you here. Judge Wallace and Judge Christin and I are going to go back and conference, talk about these cases, and then we'll come back out and have a chance to visit with you. I think our law clerks and maybe Ms. Butterfield will visit with you in the meantime. So see you in a little bit. Thank you. All rise. The court for this session stands adjourned. Thank you.
judges: Wallace, Silverman, Christen